# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

AUG 0 7 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Rigoberto Nunez, | ) | |
| Oscar Andrade, | ) | |
| Oscar Rodriguez, | ) | |
| Pablo Vargas, | ) | |
| Gregorio Nunez, | ) | 2:17-MJ-0137    EFB |
| Luis Nunez. | ) | |

_____
*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____April 2017_____ in the county of _____San Joaquin_____ in the

_____Eastern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to Distribute and Possession with the Intent to Distribute cocaine and methamphetamine |

This criminal complaint is based on these facts:

(see attachment)

⊠ Continued on the attached sheet.

**SEALED**

_____
*Complainant's signature*

Special Agent Kevin D. Falls
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/7/2017

_____
*Judge's signature*

City and state:    Sacramento, California

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF FBI SPECIAL AGENT KEVIN D. FALLS

I, Kevin D. Falls, being duly sworn, hereby depose and state:

### I.    PURPOSE

1.    Based on the facts set forth below, there is probable cause to believe that **Rigoberto NUNEZ, Oscar ANDRADE, Oscar RODRIGUEZ, Pablo VARGAS, Gregorio NUNEZ**, and **Luis NUNEZ** are members of a drug trafficking organization, currently involved in the distribution of large amounts of cocaine and methamphetamine, in the Eastern District of California, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Based on these same facts, there is probable cause to believe they use the residential properties listed herein, and use the vehicles listed herein, to facilitate their drug trafficking activities.

2.    This Affidavit therefore requests the Court to issue criminal complaints and arrest warrants for the following individuals:

1. **Rigoberto NUNEZ**
2. **Oscar ANDRADE**
3. **Oscar RODRIGUEZ**
4. **Pablo VARGAS**
5. **Gregorio NUNEZ**
6. **Luis NUNEZ**

3.    In addition this Affidavit requests authority to search the locations listed below, and described in **Attachments A-1 to A-3,** in order to locate and seize the items described in **Attachments B-1 to B-3,**[1] as evidence and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846 - Conspiracy to Distribute and Possess with Intent to Distribute Cocaine and Methamphetamine.

---

[1] For each search warrant that this Affidavit supports, only the Attachment A-# and Attachment B-# relevant to that warrant have been attached, as specified in each Application for a Search Warrant.

1

4.      Specifically, this Affidavit is made in support of search warrants for the following

residences:

| | Address | Listed Owner or Occupant | Attachment |
|---|---|---|---|
| a. | **4701 East Farmington Road #H5, Stockton, California** | R. NUNEZ | A-1 |
| b. | **3411 Phelps Street, Stockton, California** | ANDRADE | A-2 |
| c. | **7927 Montgomery Avenue, Stockton, California** | RODRIGUEZ | A-3 |

5.      This Affidavit is also made in support of search warrants for the following

vehicles:

| | Vehicle Description | Registered Owner | Attachment |
|---|---|---|---|
| a. | **Maroon BMW X3; CA license plate 7HPY462** | ANDRADE | A-2 |
| b. | **White Dodge Caravan; CA license plate 7TTG544** | RODRIGUEZ | A-3 |

## II.     AGENT BACKGROUND

6.      I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and

have been so employed since December 2005. Prior to working for the FBI, I was employed as a

police officer for the City of Sacramento. I am currently assigned to the Sacramento Field

Division Sacramento Resident Agency, and I am charged with investigating transnational

organized criminal enterprises, including drug trafficking organizations (DTO), operating in the

Eastern District of California and elsewhere.

7.      During the course of my career as a police officer and FBI Special Agent, I have

investigated DTOs, as well as street and prison gangs, for violations of federal laws governing

money laundering, racketeering, unlawful importation of controlled substances, distribution of

controlled substances, and possession with intent to distribute controlled substances, including

cocaine, methamphetamine, opium, heroin, and other dangerous drugs. I have participated in several drug trafficking investigations involving the court-authorized interception of wire, oral, and electronic communications. I have personally interviewed numerous confidential sources and street and prison gang members and executed search warrants for evidence of drug trafficking.

8.      Through my training and experience, as well as consultation with other experienced investigators in the FBI and other agencies, I have become familiar with the methods of drug traffickers and their use of telephones and other devices to conduct their criminal enterprises. I know that drug traffickers commonly use fictitious subscriber names to conceal their identities, and use coded language to discuss their drug trafficking activities. I am also familiar with their techniques to conceal assets and proceeds from their illegal activities and the types and amounts of profits made by drug trafficking.

9.      In addition to my personal knowledge, this affidavit is based on (1) information I obtained from related investigations; (2) conversations with other law enforcement officers including oral and written investigative reports that I received directly or indirectly from other law enforcement officials; (3) review and analysis of information received from various sources, including evidence provided pursuant to subpoenas, GPS tracking data, and pen register data; (4) physical surveillance conducted by law enforcement officials reported to me either directly or indirectly; (5) a review of public records, telephone toll records, and subscriber information; (6) information provided from confidential sources, and other sources of information working with law enforcement agencies; (7) a review of driver's license and automobile registration records; (8) records from various law enforcement databases, including but not limited to the National Law Enforcement Telecommunications System ("NLETS") and the National Crime Information Center ("NCIC"); (9) my training and experience as a FBI agent; and (10) the training and experience of other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit.

10.     The facts and information set forth herein are true, based upon my personal knowledge and observations, observations of other law enforcement personnel with whom I have consulted, observations of cooperating individuals as related to me, my review of investigative reports, notes, and discussions with other federal, state and local law enforcement officials. Because this affidavit is submitted for the limited purpose of supporting criminal complaints and securing the requested arrest and search warrant, I have not included the details of every aspect of the investigation. I have set forth only the facts that I believe are necessary to establish a foundation for an order authorizing the arrest of the persons, and the search and seizure of the property and locations, identified in this affidavit.

## III.     STATEMENT OF PROBABLE CAUSE

### A.     Background of Investigation

11.     In April 2017, the San Joaquin Metropolitan Narcotics Task Force (Metro) , and Homeland Security Investigations (HSI), joined the Federal Bureau of Investigation (FBI) (collectively, the "Investigating Agencies"), in an investigation into the drug trafficking activities of Rigoberto NUNEZ (R. NUNEZ), his brother, Luis NUNEZ (L. NUNEZ), operating their narcotics distribution out of Three Palms Grocery Store ("Three Palms"), located at 6732 East State Route 68, Stockton, California.[2] During the course of this investigation, agents have conducted several controlled purchases of methamphetamine from R. NUNEZ, Oscar ANDRADE (ANDRADE), and their associates, including Oscar RODRIGUEZ (RODRIGUEZ) and Gregorio NUNEZ (G. NUNEZ), utilizing a Confidential Source (the CS). The CS also traveled to Riverside, California to conduct a controlled purchase of cocaine from Pablo VARGAS (VARGAS). In addition, the CS negotiated a methamphetamine transaction with VARGAS, which led to the seizure of fifteen (15) pounds of suspected methamphetamine, in a recent traffic stop. VARGAS has been identified as a source of supply for the NUNEZ brothers.

---

[2] Three Palms Grocery Store is owned by R.NUNEZ's brother David NUNEZ (D.NUNEZ). Three Palms acts as a location for farmers in and around Stockton, California, to find migrant field workers. Three Palms also provides check cashing services for the migrant field workers, and sells beer and wine, and other general convenience store items.

During the course of this investigation, agents have utilized multiple investigative techniques such as surveillance, GPS location information, consensually recorded telephone conversations, and undercover operations, allowing the Investigating Agencies to identify the following as residences of R. NUNEZ, ANDRADE, and RODRIGUEZ, used in their drug trafficking activities, as explained more fully herein: (1) **4701 East Farmington Road #H5, Stockton, California,** (2) **3411 Phelps Street, Stockton, California,** and (3) **7927 Montgomery Avenue, Stockton, California**.

12.     The investigation has also identified the following as vehicles used by these same individuals during their drug trafficking operations, as explained more fully herein: (1) **a maroon BMW X3 bearing California license plate 7HPY462,** and (2) **a white Dodge Caravan bearing California license plate 7TTG544**.

13.     **Rigoberto NUNEZ (R. NUNEZ)** (DOB 1990) is an adult male, who is believed to be a cocaine and methamphetamine distributor based in the area of Stockton, California, within the Eastern District of California. R. NUNEZ has a misdemeanor conviction for possession of controlled substance paraphernalia. **4701 East Farmington Road #H5, Stockton** is believed to be NUNEZS's residence.

14.     **Oscar ANDRADE** (DOB 1979) is an adult male who is believed to be a cocaine, methamphetamine, and heroin distributor based in the area of Stockton, California, within the Eastern District of California. ANDRADE has a federal conviction for Distribution of "Crystal Meth or Ice," and was sentenced to 102 months prison, in 2009. **3411 Phelps Street, Stockton,** is believed to be ANDRADE's residence.

15.     **Oscar RODRIGUEZ** (DOB 1975) is an adult male who is believed to be a methamphetamine distributor based in the area of Stockton, California, within the Eastern District of California. RODRIGUEZ has misdemeanor convictions for battery and theft. RODRIGUEZ was sentenced to 4 days jail and placed on probation. **7927 Montgomery Avenue, Stockton,** is believed to be RODRIGUEZ's residence.

16.     **Pablo VARGAS** (DOB 1972) is an adult male who is believed to be a cocaine and methamphetamine distributor, based in the area of Coachella, California, within the Central District of California. VARGAS has no known criminal convictions. 83949 Avenida La Luna, Coachella, is believed to be VARGAS' residence.

17.     **Gregorio NUNEZ** (DOB 1995) is an adult male who is believed to be a cocaine and methamphetamine distributor based in the area of Indio, California, within the Central District of California. NUNEZ has no known criminal convictions. 83727 Nebo Court, Indio, is believed to be G. NUNEZ's residence.

18.     **Luis NUNEZ** (DOB 1994) is an adult male who is believed to be a cocaine and methamphetamine distributor, based in the area of Stockton, California, within the Eastern District of California. L. NUNEZ has no known criminal convictions. 1825 Church Street Unit #49, Lodi, California, is believed to be L. NUNEZ's residence.

          1.     <u>April 5, 2017 Controlled Purchase of Methamphetamine from R. NUNEZ & ANDRADE</u>

19.     During the course of this investigation into the drug trafficking organization operated by R. NUNEZ and his associates (the "NUNEZ DTO"), various investigative tools have been utilized, including the use of the CS to execute controlled purchases.[3] Between April 4, 2017, and April 5, 2017, working with the Investigating Agencies, the CS exchanged recorded telephone calls with R. NUNEZ, during which the CS negotiated the anticipated purchase of approximately a half pound of methamphetamine from R. NUNEZ, in Stockton, California.

---

[3] The CS has no criminal record. The CS is working for monetary compensation and has consistently provided reliable information. I believe the information provided by the CS related to this investigation to be reliable. Immediately before and after each controlled purchase described herein, agents searched the CS's person and vehicle for illegal items or other contraband. Each time, agents found nothing. For each transaction, agents also equipped the CS with electronic audio and video recording devices and provided the CS with a pre-determined amount of U.S. currency, to complete the transaction. Finally, agents maintained surveillance of the CS during each controlled purchase, starting from the pre-purchase search of the CS's person and vehicle, until the CS returned to the agents with the acquired narcotics.

20.     On April 5, 2017, at approximately 2:05 p.m., the CS received a telephone call from an unidentified number, which the CS did not answer, and the call went to voicemail. At approximately 2:10 p.m., the CS placed a recorded telephone call back to the unidentified number. A male answered, and the CS recognized the voice as belonging to R. NUNEZ, with whom the CS had spoken before. When the CS indicated to R. NUNEZ that the CS did not recognize this number, R. NUNEZ indicated that it was new, and that he could be reached on either the new telephone number, or the older one. The CS then asked about purchasing a half pound of methamphetamine, as the two had discussed on a previous occasion. R. NUNEZ indicated that he did not have the narcotics with him at that time, but that he would have "someone" deliver it to the CS by 4:00 p.m. that day, and arranged with the CS to meet in a Walmart parking lot (located near the intersection of Hammer Lane and Holman Road, in Stockton). R. NUNEZ further stated that he would call the CS if he were able to get the narcotics delivered before 4:00 p.m.

21.     Agents provided the CS with $2,200 in law enforcement funds to make the transaction with R. NUNEZ, and followed the CS to the planned meeting location.

22.     At approximately 4:17 p.m., the CS received a telephone call from R. NUNEZ (recorded), who told the CS that an associate, instead of himself (R. NUNEZ), would be delivering the requested amount of methamphetamine to the CS.  R. NUNEZ indicated that the associate would be driving a BMW SUV.

23.     At approximately 4:27 p.m., a **maroon BMW X3, CA license plate 7HPY462,** (which California DMV records indicate is registered to "Oscar Andrade, 2147 Laurel Street, Stockton, CA") entered the parking lot and parked alongside the CS' vehicle. The driver, later identified as ANDRADE, greeted the CS and introduced himself as "Oscar." ANDRADE entered the CS' vehicle, at which time the CS gave ANDRADE $1,900 in law enforcement funds and ANDRADE handed the CS a bag containing a half pound of suspected methamphetamine.

24.     During the transaction, ANDRADE informed the CS that the methamphetamine he was delivering at that time was not from his own supply, because his own supply had run out,

7

and he was awaiting a new shipment. ANDRADE stated he regularly deals in kilogram amounts and often provides narcotics to R. NUNEZ's customers. ANDRADE indicated he was the main narcotics supplier, rather than R. NUNEZ. ANDRADE quoted the CS prices of $7,000 per kilogram of methamphetamine, $24,500 per kilogram of cocaine, and $650 per ounce of heroin. ANDRADE gave the CS his telephone number and told the CS he would contact the CS when his next shipment of ten kilograms of methamphetamine arrived.

25.    After the controlled purchase of suspected methamphetamine from ANDRADE, the CS met with agents. The CS handed agents a plastic bag containing the suspected methamphetamine and $300 in law enforcement funds left over from the original $2,200 that agents had given the CS prior to the transaction. Agents processed, weighed, and field tested the suspected methamphetamine. The suspected methamphetamine purchased from ANDRADE on April 5, 2017 weighed approximately 288.8 gross grams (to include packaging material). The field test showed a presumptive positive result for the presence of methamphetamine.

2.    April 20, 2017, Controlled Purchase of One (1) Kilogram of Methamphetamine from ANDRADE

26.    Between April 14, 2017 and April 19, 2017, the CS exchanged recorded telephone calls with ANDRADE, during which the CS negotiated the anticipated purchase of approximately one (1) kilogram of methamphetamine from ANDRADE, in Stockton, California.

27.    On April 14, 2017, prior to the anticipated controlled purchase, the CS received a telephone call from ANDRADE (recorded). ANDRADE told the CS that he had ten (10) kilograms of crystal methamphetamine for sale. ANDRADE added that he could hold the ten (10) kilograms of methamphetamine for the CS if the CS was interested in purchasing the entire amount. The CS advised ANDRADE that the CS would have to get back to ANDRADE the following week regarding making a purchase.

28.    On April 20, 2017, at approximately 12:35 p.m., the CS met agents at a predetermined location. Agents gave the CS $7,000 in law enforcement funds to complete the transaction.

29.     At approximately 1:00 p.m., the CS placed a consensually recorded phone call to ANDRADE. During the call, the CS informed ANDRADE that the CS was en route to Stockton to meet with ANDRADE. ANDRADE responded that he was "out and about" and would need to pick up the "kilo." ANDRADE suggested they meet in the Walmart parking lot (located near the intersection of Hammer Lane and Holman Road, in Stockton) to complete the transaction.

30.     At approximately 1:38 p.m., the CS received a telephone call from ANDRADE, asking if the CS was close by. The CS indicated that he/she was, and continued conversing with ANDRADE as the CS pulled into the east entrance of the Walmart parking lot, near a Chevron station and McDonald's Restaurant.

31.     Surveillance agents located ANDRADE's **maroon BMW X3**, parked in a stall approximately 75 yards west of the CS's location. The vehicle was unoccupied.

32.     At approximately 1:39 p.m., surveillance agents observed ANDRADE walking away from a fruit vendor, located along the west side of the Hammer Lane entrance to Walmart. ANDRADE was observed talking on his cell phone and eating fruit. ANDRADE then walked directly to the CS's vehicle, opened the front passenger door, and sat inside, closing the door.

33.     At approximately 1:45 p.m., ANDRADE exited the CS's vehicle and walked west bound through the adjoining Chevron gas station parking lot. ANDRADE appeared to be speaking on his cell phone as he walked to his parked **maroon BMW X3**. An unknown Hispanic male adult (later identified as Oscar RODRIGUEZ) wearing a black baseball style hat, black shirt, and camouflage pants, walked over to ANDRADE's **maroon BMW X3**. ANDRADE and RODRIGUEZ greeted each other and walked north bound through the parking lot to a **white Dodge Caravan**. ANDRADE entered the front passenger seat and RODRIGUEZ got into the driver's seat of **white Dodge Caravan**. RODRIGUEZ and ANDRADE drove to the CS's vehicle, and parked the **white Dodge Caravan** along the passenger side. ANDRADE exited the passenger side of **white Dodge Caravan**, and got into the passenger side of the CS's vehicle. RODRIGUEZ exited the driver's seat of the **white Dodge Caravan** and walked into the Chevron store. A minute or two later, ANDRADE exited the CS's vehicle, walked over to the driver's

9

side sliding door of the **white Dodge Caravan** and retrieved a brown McDonald's paper bag from inside. ANDRADE got back into the CS's car, handed over the McDonald's bag, which appeared to contain suspected methamphetamine, and the CS handed ANDRADE $7,000 in law enforcement funds.

34.     A short time later, RODRIGUEZ walked out of the store and over to the CS's vehicle, where RODRIGUEZ opened the door and got in the back seat. With the assistance of an electronic transmitter, agents were able to hear the CS's conversation with ANDRADE and RODRIGUEZ. During that conversation, ANDRADE informed the CS that if the CS wanted five (5) or six (6) kilograms of methamphetamine, instead of just one, they could supply it at that time. ANDRADE informed the CS that RODRIGUEZ gets crystal methamphetamine from Michoacan, Mexico. RODRIGUEZ added that he gets the drugs directly from Michoacan and they arrive in the United States untouched (i.e. not adulterated).

35.     After the controlled purchase of suspected methamphetamine from ANDRADE and RODRIGUEZ, the agents followed the CS to a predetermined location. At that time, the CS provided agents with the brown paper McDonald's bag, containing the suspected methamphetamine. Agents processed, weighed, and field tested the suspected methamphetamine, which weighed approximately 1000.5 gross grams (to include packaging material). The field test showed a presumptive positive result for the presence of methamphetamine.

36.     After the meeting between the CS, ANDRADE, and RODRIGUEZ, additional surveillance units followed RODRIGUEZ, driving the **white Dodge Caravan**, to **7927 Montgomery Avenue, Stockton**, where he parked and got out of the van. RODRIGUEZ then opened the driver's side sliding door and retrieved a large bag from the same part of the **white Dodge Caravan** from which ANDRADE had retrieved the kilogram of methamphetamine he had handed to the CS during the controlled purchase. RODRIGUEZ walked into the residence with the bag. Surveillance was then terminated. Because ANDRADE's offer to sell the CS up to five (5) or six (6) kilograms of methamphetamine during the controlled purchase that day, it is probable that this bag contained those extra kilograms of methamphetamine.

3.   May 3, 2017 Controlled Purchase of Methamphetamine from R. NUNEZ and ANDRADE

37.   On May 3, 2017, the CS met agents at a predetermined location, and they provided him with $2,000 in law enforcement funds.

38.   At approximately 10:55 a.m., the CS placed a recorded telephone call to R. NUNEZ.  The call rang twice and went voicemail. A short time later, the surveillance team escorted the CS to Three Palms, where the CS went inside.

39.   While at Three Palms, the CS spoke to R. NUNEZ about purchasing methamphetamine. R. NUNEZ told the CS that he (R. NUNUZ) would contact ANDRADE, and ANDRADE would complete the narcotics transaction with the CS.  R. NUNEZ told the CS he would have ten (10) kilograms of cocaine for sale the following week, if the CS was interested in purchasing cocaine.

40.   Upon leaving Three Palms, the CS received several calls from ANDRADE. The CS did not answer the telephone, and the calls went to voicemail.

41.   At approximately 11:21 a.m., the CS placed a recorded call to ANDRADE, during which the CS requested to purchase half a pound of methamphetamine, and agreed to meet ANDRADE in the same Walmart parking lot at which they had executed the April 20, 2017 transaction.

42.   At approximately 12:21 p.m., the CS met with ANDRADE in the Walmart parking lot. During this interaction, ANDRADE handed a bag to the CS, containing suspected methamphetamine, and the CS gave ANDRADE to $2,000 in law enforcement funds.

43.   After the controlled purchase of suspected methamphetamine from ANDRADE, the CS met agents at a predetermined location. At that time, the CS handed the agents a plastic bag containing the suspected methamphetamine. Agents processed, weighed, and field tested the suspected methamphetamine, showing it to be presumptively positive for methamphetamine, and weighing approximately 259.3 gross grams (including packaging material).

**B.**     **Identification of VARGAS as Narcotics Source of Supply**

1.     May 18, 2017 Attempted Controlled Purchase of Methamphetamine from
R. NUNEZ

44.     On May 18, 2017, agents attempted another controlled purchase, again with the
CS's assistance.

45.     At approximately 1:50 p.m., the CS traveled to Three Palms in an effort to contact
R. NUNEZ, in order to arrange another methamphetamine purchase from ANDRADE.[4] The CS
planned to contact R. NUNEZ, as the CS had done before, and ask R. NUNEZ to contact
ANDRADE. In earlier transactions, R. NUNEZ had called ANDRADE on a cell phone the CS
knew ANDRADE to carry, but for which the CS did not have the number.

46.     At approximately 2:00 p.m., the CS arrived at Three Palms, and spoke with
L. NUNEZ who informed the CS that R. NUNEZ was working the "cherries" (supervising
migrant field workers) with his other brother, and was unavailable. L.NUNEZ informed the CS
that when R. NUNEZ works the "cherries" he did not arrange narcotics transactions. The CS told
L. NUNEZ that he/she had tried to contact ANDRADE to buy some methamphetamine, but that
ANDRADE was not answering his phone. L. NUNEZ asked why the CS was purchasing
narcotics from ANDRADE instead of from L. NUNEZ's family member "PABLO" (later
identified as Pablo VARGAS). L. NUNEZ told the CS that VARGAS lived in Indio, California,
and that VARGAS could get the CS as much cocaine and methamphetamine as the CS wanted.

47.     L. NUNEZ then called VARGAS with the CS present. L. NUNEZ spoke to
VARGAS, then handed the CS the phone. The CS spoke to VARGAS briefly and indicated
he/she would call VARGAS in the future to arrange to purchase narcotics. After the call,
L. NUNEZ gave the CS VARGAS' telephone number, so that the CS could be in contact with
VARGAS directly.

---

[4] As explained above, during the April 5, 2017 and May 3, 2017 controlled purchases, the CS had
contacted R. NUNEZ to arrange to purchase narcotics. But, on both occasions, Oscar ANDRADE had
turned up to execute the transaction, instead of R. NUNEZ. Therefore, by this point, the CS expected the
purchase to occur in the same way.

48.     Shortly thereafter, at approximately 2:33 p.m., the CS placed a consensually recorded call to VARGAS. During the conversation, the CS and VARGAS discussed future narcotics transactions. VARGAS asked if the CS would be travelling down to Indio, California, to pick up the narcotics. VARGAS indicated the price for the narcotics would be much cheaper if the CS picked up the narcotics in Indio, as opposed to VARGAS arranging to have the narcotics transported to the CS in Stockton. VARGAS indicated he would get back to the CS regarding specific prices.

49.     At approximately 9:10 p.m. that same day, the CS received a another phone call from VARGAS. During the recorded call, VARGAS informed the CS it would cost $28,000 for a kilogram of cocaine and $2,800 for a pound of crystal methamphetamine. VARGAS advised the CS that he would like to meet the CS prior to conducting any narcotics transactions.

50.     The next day, on May 19, 2017, at approximately 5:20 p.m., the CS received a call from VARGAS. During the recorded call, VARGAS informed the CS that he had checked with his "boss,"[5] who had authorized VARGAS to sell the CS kilograms of cocaine for $24,000 to $25,000.

2.     June 8, 2017 Controlled Purchase of Cocaine from VARGAS

51.     Between May 27, 2017 and June 5, 2017, the CS and VARGAS exchanged several recorded calls, during which time the CS the arranged the anticipated purchase of approximately one quarter pound of cocaine for $3,600, and one pound of methamphetamine for $2,900, from VARGAS, in Riverside, California.

52.     On June 8, 2017, prior to the anticipated operation, agents provided the CS with $6,500.00 in law enforcement funds.

53.     At approximately 10:15 a.m., the CS placed a recorded telephone call to VARGAS and arranged a meeting time and location for the narcotics transaction.

---

[5] At the time of writing, agents have not identified the individual to whom VARGAS refers as his "boss."

54.     At approximately 10:24 a.m., the surveillance team escorted the CS to the arranged location, a Stater Brother's parking lot, located at 2995 Iowa Avenue, Riverside, California. At approximately 10:30 a.m., VARGAS arrived, driving a **brown Chevrolet Silverado Pickup Truck, CA license plate 37121R1** (which California DMV records indicated is registered to "Pablo Vargas, 83949 Avenida La Luna, Coachella, California"). VARGAS exited his truck and walked over to the CS's vehicle. The CS and VARGAS spoke while standing next to the CS's vehicle, before both getting in to the CS's vehicle . VARGAS told the CS that he did not have any "crystal" (methamphetamine) at that time because other buyers had already purchased everything he had. VARGAS said his "boss" had set aside 20 pounds for him and another associate, but they had not been able to sell it, so the "boss" gave it to yet another associate to sell. VARGAS said there was a shipment of "crystal" coming later that day to Indio, California, however, and asked if the CS wanted to wait to get the pound of methamphetamine.

55.     The CS then asked if VARGAS had the cocaine, and VARGAS responded that he did. VARGAS got out of the CS's vehicle and retrieved the suspected cocaine from the **brown Chevrolet Silverado Pickup Truck**.  Upon his return to the CS's vehicle, the CS asked VARGAS where the cocaine was from and VARGAS said they get it from Culiacan, Mexico and Sinaloa, Mexico. VARGAS added that they get the "crystal" from the same place, but also get it from Michoacan, Mexico. VARGAS then gave the CS the bag containing the suspected cocaine and the CS gave VARGAS $3,600.00 in law enforcement funds.

56.     After the controlled purchase of suspected cocaine from VARGAS, the CS met agents at a predetermined location.  At that time, the CS handed the agents a plastic bag containing the suspected cocaine, and returned $2,900.00 out of the $6,500.00 in law enforcement funds provided to the CS. Agents processed, weighed, and field tested the suspected cocaine, finding it to test presumptively positive for cocaine, and weighing approximately 104 gross grams (including packaging material).

      3.    <u>July 20, 2017 Seizure of 15 Pounds of Methamphetamine from VARGAS</u>

57.    Between June 8, 2017, and July 10, 2017, the CS and VARGAS exchanged several recorded calls, during which time the CS negotiated the anticipated purchase of approximately 30 pounds of methamphetamine, and 10 kilograms of cocaine.  Initially, VARGAS offered to transport the narcotics to Northern California to complete the transaction. After making this offer, however, VARGAS' "boss" instructed him that the CS would either need to travel down to Coachella, California, to complete the transaction, or pay for the narcotics prior to shipment to Northern California.

58.    On July 10, 2017, the CS received a call from VARGAS (recorded). During the call, VARGAS asked if the CS was still interested in making the deal, and the CS responded that he/she was. VARGAS told the CS he was going to transport 15 pounds of methamphetamine from Coachella to Stockton, and requested to complete the deal at L. NUNEZ's apartment (1825 Church Street Unit #49, Lodi, California), on July 20, 2017. VARGAS told the CS he would leave his own residence, in Coachella, early in the morning on July 20, 2017, and arrive at L. NUNEZ's apartment in Lodi, around 8:30 a.m. or 9:00 a.m.

59.    Between July 11, 2017 and July 18, 2017, the CS and VARGAS exchanged several recorded calls, during which they continued to negotiate the upcoming purchase of the 15 pounds of methamphetamine.

60.    On July 19, 2017, FBI agents installed a court-authorized vehicle tracker onto the **brown Chevrolet Silverado Pickup Truck**. The installation took place in Indio, California.

61.    On July 20, 2017, at approximately 1:30 a.m., agents were notified via tracker information that the **brown Chevrolet Silverado Pickup Truck** was in motion, leaving Indio, and traveling Northbound on Interstate 5 (I-5).

62.    Surveillance units travelled to Los Banos, California and contacted a California Highway Patrol K-9 unit for assistance.

63.    At approximately 6:30 a.m., surveillance units observed the **brown Chevrolet Silverado Pickup Truck** traveling northbound on I-5. Surveillance units caught up to the **brown**

**Chevrolet Silverado Pickup Truck**, and observed VARGAS driving the vehicle, accompanied by an unknown Hispanic male (later identified as Gregorio NUNEZ (G. NUNEZ)).

64.     The CHP K-9 unit initiated a traffic stop on the **brown Chevrolet Silverado Pickup Truck** for having expired vehicle registration stickers. During the stop, the narcotics detection K-9 alerted to the presence of narcotics within the vehicle. The CHP officer contacted agents and informed them of K-9's alert. CHP officers conducted a search of **brown Chevrolet Silverado Pickup Truck** and found several sealed packages inside a suitcase in the pickup. The CHP officer advised that, based upon his training and experience, the K-9's alert, and the appearance of the packages, he believed them to contain methamphetamine. VARGAS and G. NUNEZ were arrested and booked into Merced County Jail.

65.     Agents took possession of the suspected methamphetamine from CHP. Agents processed, weighed, and field tested the suspected methamphetamine, resulting in a presumptively positive indication for methamphetamine, and weighing approximately 7,598.7 gross grams (including packaging material).

66.     Following the arrest, agents interviewed G. NUNEZ. Before starting the interview, agents read G. NUNEZ his Miranda rights, which he indicated he understood, and he agreed to continue the interview. G. NUNEZ indicated that he met VARGAS at VARGAS' home before the two of them started the drive to Lodi. During the interview, G. NUNEZ also consented to a search of his telephone, on which agents found text messages between G. NUNEZ and VARGAS. In a recent part of that exchange, G. NUNEZ requested directions to VARGAS' home, shortly before meeting VARGAS at his residence.

67.     G. NUNEZ indicated that the suitcase in which officers had found the methamphetamine was his suitcase, but it had been at VARGAS' house prior to G. NUNEZ's arriving to start their journey (which agents understood to mean the suitcase had been at VARGAS' house without G. NUNEZ having been there with it). G. NUNEZ indicated the suitcase was packed with his clothes and loaded into VARGAS' vehicle prior to his arrival at VARGAS' residence, and their starting the journey to Lodi.

### C.   Confirmation of Residences and Vehicle Ownership

    1.   4701 East Farmington Road #H5, Stockton, California

68.   On February 1, 2017, agents from the Alcoholic Beverage Control ("ABC") spoke with R. NUNEZ at Three Palms, regarding routine issues agents from ABC discuss with proprietors of stores licensed to sell alcohol. During the visit, R. NUNEZ told the agents that his residential address was **4701 East Farmington Road, #H5, Stockton**.

69.   A search of records from the California DMV shows that R. NUNEZ lists **4701 East Farmington Road #H5, Stockton,** as his residential address on his California driver's license. In addition, a records check in July 2017, indicated that R. NUNEZ is publicly listed on the utilities for **4701 East Farmington Road #H5, Stockton**.

    2.   3411 Phelps Street, Stockton, California

70.   A July 2017 search of a law enforcement database lists ANDRADE on the utilities for **3411 Phelps Street, Stockton**.

71.   In addition, during a separate narcotics investigation conducted by Metro, agents established that ANDRADE resides at **3411 Phelps Street, Stockton**. On February 2, 2017, Metro served a state narcotics search warrant at **3411 Phelps Street, Stockton**. Agents spoke with ANDRADE during that search and identified him as a resident of this address.

72.   ANDRADE, who is on Supervised Release from a previous federal conviction for distribution of narcotics, lists **3411 Phelps Street, Stockton** as his address of record and lists the **maroon BMW X3** as his primary vehicle.

    3.   7927 Montgomery Avenue, Stockton, California

73.   A search of a law enforcement database lists RODRIGUEZ as a resident at **7927 Montgomery Avenue, Stockton, California**

74.   Throughout this investigation, RODRIGUEZ has been observed at **7927 Montgomery Avenue** on several occasions. As recently as August 1, 2017, RODRIGUEZ called police to report a missing child, and gave officers this address as the one at which to speak with

him.[6]  When officers met with RODRIGUEZ at this address, he confirmed it was his residence. In addition, a week earlier, on July 25, 2017, agents observed the **white Dodge Caravan** parked in the parking space for **7927 Montgomery Avenue, Stockton.**

               4.    White Dodge Caravan

      75.    On July 11, 2017, surveillance agents observed RODRIGUEZ drive the **white Dodge Caravan** to **3411 Phelps Street, Stockton.** Upon his arrival, agents observed ANDRADE exit **3411 Phelps Street, Stockton** and enter the **white Dodge Caravan**'s front passenger seat. Surveillance agents followed the **white Dodge Caravan** and requested a marked unit stop the vehicle for having no license plates. RODRIGUEZ and ANDRADE were contacted and RODRIGUEZ was found to be driving without a license. The **white Dodge Caravan** was then searched and towed, and RODRIGUEZ and ANDRADE were released without incident.

## IV.    CONCLUSION

      76.    Based on the foregoing, there is probable cause to believe that R. NUNEZ, ANDRADE, RODRIGUEZ, VARGAS, G. NUNEZ, and L. NUNEZ, have committed, are committing, and will continue to commit violations of 21 U.S.C. §§ 841(a)(1) and 846.

      77.    I believe that R. NUNEZ resides at **4701 East Farmington Road #H5, Stockton.** Given R. NUNEZ's central role in the NUNEZ DTO, described herein, I believe evidence related to the distribution of cocaine and methamphetamine may be found at this location.

      78.    I believe that ANDRADE resides at **3411 Phelps Street, Stockton.**

      79.    Based on the controlled purchases of large amounts of methamphetamine from ANDRADE, observations made by surveillance agents, a previous narcotics investigation which involved execution of a search warrant at **3411 Phelps Street, Stockton,** I believe evidence may be found within **3411 Phelps Street, Stockton,** and the **maroon BMW X3,** that is related to the distribution of methamphetamine and the continued conspiracy to distribute methamphetamine.

---

[6] Agents do not believe that RODRIGUEZ's report of the missing child is related to the investigation described herein. At the time of writing, the child was reported as having been found.

80.     I believe that RODRIGUEZ resides at **7927 Montgomery Avenue, Stockton** and uses the **white Dodge Caravan** to facilitate his drug trafficking activities.

## V.     AFFIANT'S EXPERIENCE REGARDING ITEMS TO BE SEIZED

81.     Based on my training and experience and consultations with other federal, state, and local law enforcement personnel, I believe the following to be true:

82.     Persons involved in the distribution of controlled substances often maintain at their residences, outbuildings, secondary residences, businesses, and vehicles, quantities of controlled substances, as well as paraphernalia for manufacturing, use, packaging, and distribution of controlled substances. Drug traffickers also maintain records relating to their trafficking activities in these same places. These records include personal calendars, address/telephone books, and papers reflecting the names, addresses, pager, telephone, and fax numbers relating to their drug trafficking associates. These records can be in written form. Drug traffickers also keep stored messages and telephone numbers relating to their trafficking activities within electronic pagers and/or beepers. Further, drug traffickers often keep photographs and audio/video recordings depicting themselves and their associates, as well as their assets and controlled substances. They may also keep electronic equipment used for counter surveillance including scanners, cameras, monitors, and anti-bugging devices.

83.     Premises and vehicles used by individuals involved in drug dealing usually contain articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting, or controlling the premise or property.

84.     Persons involved in the distribution of controlled substances often maintain records and ledgers listing their trafficking activities in these same places. These records are kept to keep track of the ordering, purchasing, storage, distribution, and transportation of controlled substances. After drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and accounts payable, and to record the names and telephone numbers of suppliers, customers and co-

conspirators. These records are often maintained not only on paper, but also as electronic or digital data in the form of computer hardware and software.

85.     Individuals involved in drug trafficking often use telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business. Individuals involved in drug trafficking must often rely on others to obtain drugs and to help obtain, market, distribute, and/or protect drugs. To achieve some of the aforementioned objectives, I am aware that drug distributors will often, among other methods, have a courier transport drugs or drug proceeds or ship controlled substances/drug proceeds through the mail or by common carrier. Evidence related to the identities of these co-conspirators are often maintained in these locations.

86.     Individuals involved in drug trafficking often maintain large amounts of U.S. currency to maintain and finance their on-going drug business. In addition, assets generated by their drug business are typically kept on-hand by drug dealers to avoid detection by authorities and/or reporting requirements. Individuals involved in drug trafficking often attempt to legitimize the source of these profits. In order to do this, they attempt to secrete, transfer and conceal the money by, among other ways: (a) placing assets in names of nominees to avoid detection, while still maintaining control of the assets; (b) laundering money through what appears to be a legitimate business or businesses; (c) hiding money in their homes, safes, or safety deposit boxes; (d) and using money to buy assets that are hard to trace by law enforcement. Records of these transactions are often found in the aforementioned locations.

87.     Additionally based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic trafficking acquire personal and real property with their narcotic proceeds, and maintain evidence of financial transactions related to obtaining, transferring, secreting, or the spending of large sums of money made from drug trafficking activities. These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records. Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds,

precious metals, gold, diamonds, and other jewelry in an attempt to hide large amounts of currency, and that evidence of such will be located at the described locations.

88.  Individuals involved in narcotics trafficking often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations.

89.  Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions. These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution. Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the premises, or in the vehicles, to be searched, as indicated in **Attachments B-1 to B-3**, attached to each of the locations requested.

90.  Individuals involved in drug trafficking often conceal evidence of their involvement in vehicles and outbuildings to prevent detection and seizure by law enforcement conducting lawful search warrants at residences. I believe further that persons involved in the distribution of drugs will store items, further described in **Attachments B-1 to B-3**, which is incorporated herein by reference, and that those items are used by drug traffickers in furtherance of their drug trafficking, or are obtained by drug traffickers as a result of their drug trafficking. Therefore, I am requesting permission to search all vehicles and outbuildings located at each of the locations requested.

91.  Based on my training, experience, and conversations with other experienced agents, I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income. These methods include cash purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "fronts" in an attempt to legitimize and conceal illegal activities, and the use of "off-shore" banking in an attempt to break the paper trail. These and other schemes are commonly referred to as "money laundering."

92.     Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accounts to complete financial statements and tax returns for their business and personal returns.

93.     Persons engaged in illegal activities and/or money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computer media.

94.     Persons engaged in illegal activities and/or money laundering often maintain such records for long period of time, particularly when they are involved in ongoing criminal conduct over a long period of time.

95.     There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card or banking documents, travel documents, receipts, documents reflecting asset purchases, personal calendars, telephone and address directories, checkbooks, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence.

96.     Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc. Records of such instruments are routinely maintained at the individual's residence or place of business.

97. The terms "evidence" and "documents" as used above include all of the items of evidence described in **Attachments B-1 to B-3** in whatever form and by whatever means such evidence or documents, their drafts or their modifications, may have been crated or stored.

## VI.     REQUEST TO SEAL

98. This Affidavit contains information regarding potential targets, which if unsealed, may jeopardize the very information sought to be gained by the Search Warrants, and may complicate execution of the Arrest Warrants, in support of which I submit this Affidavit. In light of the on-going nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, I request that this Affidavit and the resulting Arrest Warrants and Search Warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation and arrests, and a copy of the Search Warrant and an inventory of any items seized that will be left at the locations of the execution of the Search Warrants.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

Kevin D. Falls, Special Agent
U.S. Federal Bureau of Investigation

Sworn to and subscribed before me on 8/7/2017.

Hon. Edmund F. Brennan
United States Magistrate Judge

Approved as to form:

James R. Conolly
Assistant United States Attorney

23

PENALTY SLIP

**Defendants:**

2:17 - MJ - 0137    EFB

    **RIGOBERTO NUNEZ,**
    **OSCAR ANDRADE,**
    **OSCAR RODRIGUEZ,**
    **PABLO VARGAS,**
    **GREGORIO NUNEZ,**
    **LUIS NUNEZ.**

**Violation:**        21 U.S.C. §§ 846 and 841(a)(1) – Conspiracy to Distribute and Possess
                                          with Intent to Distribute Cocaine and
                                          Methamphetamine

**Penalty:**        Not more than 20 Years Imprisonment,
                $10,000,000 Fine or both;
                Minimum 3 Years TSR

**Court Assessment:**    $100 each count